UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

**CATHERINE MCCALPINE**,                    Case Number 1:13 CV 599

    Plaintiff,                              Judge James S. Gwin

    v.                                      REPORT AND RECOMMENDATION

**COMMISSIONER OF SOCIAL SECURITY**,

    Defendant.                              Magistrate Judge James R. Knepp II

### INTRODUCTION

Plaintiff Catherine McCalpine seeks judicial review of Defendant Commissioner of Social Security's decision to deny disability insurance benefits (DIB) and supplemental security income (SSI). The district court has jurisdiction under 42 U.S.C. § 405(g) and § 1383(c)(3). This matter has been referred to the undersigned for a Report and Recommendation pursuant to Local Rule 72.2(b)(1). (Non-document entry dated March 20, 2013). For the reasons stated below, the undersigned recommends the Commissioner's decision be affirmed.

### PROCEDURAL BACKGROUND

Plaintiff filed applications for DIB and SSI on December 1, 2009. (Tr. 147, 152). Her claims were denied initially and on reconsideration. (Tr. 84, 87, 94, 100). Plaintiff requested a hearing before an administrative law judge (ALJ). (Tr. 107). At the hearing Plaintiff, represented by counsel, and a vocational expert (VE) testified. (Tr. 31). On October 25, 2011, the ALJ concluded Plaintiff was not disabled. (Tr. 8). Plaintiff's request for appeal was denied, making the decision of the ALJ the final decision of the Commissioner. (Tr. 1); 20 C.F.R. §§ 404.955, 404.981, 416.1455, 1481. On March 20, 2013, Plaintiff filed the instant case. (Doc. 1).

**FACTUAL BACKGROUND**

*Plaintiff's Background, Vocational Experience, and Daily Activities*

Plaintiff was 44 years old at the time of the ALJ's decision. (Tr. 25, 227). Plaintiff has a tenth grade education and prior relevant work experience as a housekeeper. (Tr. 24, 171). Plaintiff also babysat her grandchildren full time until 2008, when she switched to part-time and babysat one or two days per week for four or five hours at a time. (Tr. 43).

At the hearing, Plaintiff said she could not work due to sleep apnea, biweekly migraines unrelieved by medication, carpal tunnel syndrome, depression, and leg, back, shoulder, and hip pain. (Tr. 37-40, 42). Plaintiff testified she is four feet, eleven inches tall and weighs 253 pounds. (Tr. 37). Plaintiff said she had trouble lifting anything heavier than a plate, sleeping, buttoning, zipping, or tying her shoes. (Tr. 37-41).

Plaintiff testified to having ten or fifteen "good" days per month when she would call her daughter to spend time with her grand kids. (Tr. 42). On the remaining "bad" days, she would stay "locked up in [her] room." (Tr. 42). Plaintiff was single and lived at home with her mother, her two children, nine year old nephew, and mother's seven year old adoptive daughter. (Tr. 42, 462). She stopped babysitting in 2010 due to back pain and claimed to have no hobbies or interests and did not attend religious services. (Tr. 43). Plaintiff never learned to drive and said her mother or daughter went grocery shopping because she had difficulty concentrating. (Tr. 43).

With regard to daily activity, Plaintiff did laundry but her nephew carried the basket up and down the stairs, visited family a few times per month, talked to her mother, straightened up her room, took baths, sat in bed, and listened to television. (Tr. 44-45). Elsewhere in the record, Plaintiff said she washed dishes; read one book per week and understood what she read; swept the house once per week; cleaned the bathrooms daily; cooked complete meals every other day;

2

and went grocery shopping monthly with her mother or brother. (Tr. 178-80, 208-11, 481-83). In her 2008 function report, Plaintiff indicated she had trouble maintaining personal care. (Tr. 179). However, in a 2010 function report, Plaintiff said she had no trouble maintaining personal care. (Tr. 209).

***Medical Evidence***

On July 2, 2008, Plaintiff went to the emergency room with complaints of sharp pain in her right hip which had persisted for three weeks. (Tr. 264). Left hip x-rays were negative for abnormality and the treatment provider indicated the pain was likely caused by degenerative disc disease of the lumbar spine. (Tr. 264-65).

A few days later, Plaintiff treated at BWY Family Practice ("BWY"). (Tr. 266). She complained of throbbing pain in her right hip that was worse when lying supine and unrelieved by Percocet. (Tr. 266-67). Plaintiff's straight leg raise test was positive on the right side, she walked with a limp, and had pain with palpitation on her right trochanter. (Tr. 267). Plaintiff was diagnosed with hypertension, osteoarthritis localized in her lower leg, and enthesopathy of the hip. (Tr. 268).

On August 4, 2008, Plaintiff presented to Dr. Eugene W. Lin with complaints of low back pain. (Tr. 269). Dr. Lin noted Plaintiff ambulated with stiff legs, her heel and toe walks were abnormal, and she had difficulty raising up on her toes on the ride side. (Tr. 271). Plaintiff's range of motion was moderately decreased in all planes, there was evidence of a trigger point at the right buttocks and the right greater trochanter, and she had a positive straight leg raise test on the right side. (Tr. 271). Plaintiff had normal sensation in all dermatomal regions in both her bilateral upper and lower extremities. (Tr. 271). Dr. Lin diagnosed history of lumbar spondylosis and possibly right troch bursitis. (Tr. 272).

3

Plaintiff returned to Dr. Lin on August 18, 2008, and reported less numbness but residual pain from her buttock down the back of her leg. (Tr. 273). On exam, Plaintiff sat more comfortably, had improved range of motion in her back, and improved gait. (Tr. 274). Dr. Lin diagnosed a history of lumbar spondylosis, likely radicular symptoms, and suggested she go to physical therapy. (Tr. 274).

On October 20, 2008, Plaintiff treated with Dr. John Sorg and complained of low back pain that began in July 2008, was a 7/10 on the pain scale, and was worse at night. (Tr. 365). On examination, Plaintiff's reflexes were trace throughout the upper and lower extremities, possibly due to the heavy weight of her limbs. (Tr. 366). She had normal sensation in all dermotomal regions and normal motor strength. (Tr. 366). Plaintiff was diagnosed with a history of lumbar spondylosis and likely radicular symptoms. (Tr. 366).

On July 14, 2009, Plaintiff went to BWY for a follow-up visit where she reported feeling depressed and discouraged by slow weight loss. (Tr. 346). Plaintiff said she did not take care of herself because she was very involved in taking care of her grandchildren. (Tr. 346). She was encouraged to try an antidepressant and continue her weight-loss regimen. (Tr. 347).

Plaintiff went to the MetroHealth Medical Center ("MHMC") emergency room on September 29, 2009, after suffering an episode of feeling funny and dizzy, forgetting how to spell and write, being unable to grasp, having trouble speaking, and having a headache. (Tr. 319). Upon arrival, Plaintiff hyperventilated and stated her bilateral hands felt numb and her arms felt heavy. (Tr. 319). Plaintiff was diagnosed with a transient ischemic attack ("TIA" or mini-stroke) and discharged. (Tr. 326).

At a follow-up visit on October 1, 2009, Plaintiff reported headaches in her right forehead that came and went, lasted for an hour, and self-resolved. (Tr. 314-15). Plaintiff said she had

4

been on Wellbutrin for two months and reported it helped "somewhat". (Tr. 314-15).

On October 14, 2009, Plaintiff went to the MHMC weight management clinic where she exhibited diminished vibratory sensation in her right foot and limited exercise tolerance due to right knee pain and shortness of breath. (Tr. 306). Plaintiff had a good range of motion but trace edema in her right hand and right knee pain with flexion and extension. (Tr. 306). Plaintiff was diagnosed with obesity and progressive osteoarthritis in the right knee and instructed to continue her diet and exercise regimen. (Tr. 307).

On December 4, 2009, Plaintiff visited the MHMC neurology department to address complaints of headaches and history of TIA. (Tr. 294). Plaintiff's physical examination was generally unremarkable, but she exhibited clinical evidence of carpal tunnel syndrome in the right hand causing decreased grip. (Tr. 298). Her headaches were suspected to be migraine and the treatment provider suggested Plaintiff get proper rest and practice good sleep hygiene. (Tr. 298).

Plaintiff had a follow-up visit at the MHMC weight management clinic on December 14, 2009. (Tr. 287). There, review of Plaintiff's symptoms was unremarkable. (Tr. 288). She had improved hypertension, hyperlipidemia, and continuous positive airway pressure ("CPAP") machine compliance and lost 23 pounds since her initial visit to the clinic. (Tr. 292). Her depression was noted to be "OK", but her headaches remained problematic. (Tr. 292). Plaintiff was instructed to continue her diet and exercise regimen. (Tr. 292).

On January 15, 2010, Plaintiff returned to the MHMC neurology department with complaints of hand pain, numbness, and tingling, all worse in her right hand and at night, and difficulty gripping. (Tr. 398-99). Plaintiff said she did not wear braces or take NSAIDs because they were not helpful in the past. (Tr. 399). An EMG showed moderate carpal tunnel syndrome

5

in the right hand and a neurological examination showed decreased sensation in the first to third digits of the right hand but full motor strength and a normal gait. (Tr. 401). Plaintiff was directed to wear wrist splints at night and referred to orthopedics. (Tr. 402).

Plaintiff returned to the MHMC weight management clinic on February 10, 2010, and reported fragmented sleep due to leg pain and shortness of breath. (Tr. 424, 426). Plaintiff said she used her CPAP nightly, but did not reset the pressure ramp when she was awakened and did not use a humidifier. (Tr. 425). Nevertheless, she said the CPAP improved her sleep. (Tr. 425). The treating nurse advised Plaintiff to use a humidifier to improve her comfort while using the CPAP and congratulated Plaintiff on successful weight loss. (Tr. 425).

Plaintiff treated again at the MHMC weight management clinic on February 23, 2010. (Tr. 416). Plaintiff complained that her living situation remained problematic. (Tr. 417). Specifically, Plaintiff said her son lived with her but did not contribute to the household, and the other children who lived in the home either talked to themselves or not at all and had attitude problems. (Tr. 417). Due to her progress, the clinic did not recommend continued follow-up visits and instructed Plaintiff to continue her diet, exercise, and medication regimen. (Tr. 422).

On March 24, 2010, Plaintiff presented to the orthopedic department at MHMC. (Tr. 452). There, Stephen H. Lacey, M.D., examined Plaintiff and found her hand was normal proximal to the right wrist, there was a Phalen's test in the right hand after 40 seconds, Thenar strength was excellent, Tinel's sign was negative, and circulation was excellent. (Tr. 452). However, Dr. Lacey noted review of a recent EMG showed moderate changes consistent with carpal tunnel syndrome. (Tr. 452). Dr. Lacey recommended a right hand carpal tunnel release, which Plaintiff underwent later that month. (Tr. 446).

On September 16, 2010, Plaintiff went to the emergency room with complaints of low

6

back pain, which started when she got up and heard a cracking sound. (Tr. 638, 643). Plaintiff had a full range of motion in all four extremities, normal strength and sensation, intact dorsi and plantar flexion in both feet, and no edema or calf tenderness. (Tr. 644). She was diagnosed with acute back strain and prescribed Percocet. (Tr. 644, 646).

An October 1, 2010, x-ray of Plaintiff's shoulder revealed mild asymmetric right acromioclavicular ("AC") joint degenerative changes. (Tr. 552).

On October 3, 2010, Plaintiff treated with Kenneth B. Frisof, M.D., at BWY for complaints of back and right shoulder pain relieved by Percocet. (Tr. 653-55). Plaintiff had lost 40 pounds in the previous year and examination revealed a tender right AC joint but full abduction of the right shoulder and no spinal percussion or tenderness in the sacroiliac joint or paraspinal. (Tr. 654). Dr. Frisof noted Plaintiff had poor control of her blood pressure and was not taking her medication regularly. (Tr. 655).

On November 15, 2010, Plaintiff treated for right shoulder pain and left carpal tunnel syndrome at MHMC. (Tr. 622). She reported overhead activities were painful and complained of numbness and a burning sensation in her hand, specifically her thumb, index finger, and small finger. (Tr. 622). Plaintiff said she used a splint at night but the splint did not relieve her symptoms. (Tr. 622). Plaintiff had limited active range of motion secondary to pain, but full passive range of motion. (Tr. 622). She had 4/5 or 5/5 strength of her supraspinaturs and 5/5 strength of her external rotators. (Tr. 622). Plaintiff's left wrist showed a positive median nerve compression test and a positive Tinel sign. (Tr. 622). There was no gross arthritis of Plaintiff's right shoulder, but there was some arthrosis in the AC joint. (Tr. 622). Plaintiff received a right shoulder injection and was diagnosed with carpal tunnel syndrome and impingement syndrome of the shoulder. (Tr. 622, 624).

7

On December 7, 2010, an EMG revealed evidence of left median sensorimotor mononeuropathy at or distal to the wrist (carpal tunnel syndrome), of moderate severity with demyelination in nature. (Tr. 607).

On January 31, 2011, Plaintiff saw Kasra Ahmadinia, M.D., for evaluation of her left carpal tunnel and right shoulder. (Tr. 596). Plaintiff had positive Durkin's compression test and Neer impingement sign and pain with resisted forward flexion, supraspinaturs testing, at the AC joint with cross body abduction, and along the bicipital tendon. (Tr. 596).

On February 17, 2011, Plaintiff presented to the MHMC emergency room for a right calf injury. (Tr. 585). The treatment providers indicated Plaintiff "was dancing last night and felt pop 'in back of my knee and calf and pain and I had to stop dancing'".[1] (Tr. 585). Plaintiff was neurologically intact with full muscle strength and no deep calf tenderness, diagnosed with an acute right gastoc strain, and given crutches. (Tr. 586, 593).

On March 7, 2011, Plaintiff returned to the MHMC weight management clinic. (Tr. 574). She attributed her year-long hiatus in treatment to "family matters" but demonstrated motivation to get back on track. (Tr. 576, 579). Plaintiff's physical examination was generally unremarkable aside from morbid obesity. (Tr. 577). She said her depression had gradually worsened and she spent approximately fourteen hours per day in bed. (Tr. 579). The clinic resumed Plaintiff's calcium and Wellbutrin regimen. (Tr. 579).

The next day, Plaintiff reported to BWY with complaints of right calf pain, which was reduced by rest and localized ice but not medication. (Tr. 569-71). Shani Muhammad, M.D., reported Plaintiff had intact strength, could walk, had excellent hypertension control, and

---

1. At the hearing, Plaintiff denied she was dancing. (Tr. 54-55).

diagnosed a calf muscle strain and tear. (Tr. 570).

Plaintiff had a pre-surgery evaluation on April 4, 2011 and underwent left carpal tunnel release surgery one week later. (Tr. 559, 566-67).

On April 21, 2011, Plaintiff treated with Zachary Gordon, M.D., and reported she experienced incisional pain at night and occasional tingling in her thumb. (Tr. 526). Dr. Gordon indicated the incision was well healed and there was no erythema. (Tr. 526). He recommended occupational therapy and use of a splint for nighttime support. (Tr. 526).

On April 25, 2011, Plaintiff attended occupational therapy with Pam Tomm, O.T., where she performed therapeutic exercises and had a roller wrist splint fabricated. (Tr. 530). Ms. Tomm indicated Plaintiff had significant pain and sensitivity in her hand and may require additional visits if she did not improve. (Tr. 530). Plaintiff was instructed to utilize a splint, continue taking pain medication, and begin a home exercise program. (Tr. 529-30).

Plaintiff returned to the MHMC weight management clinic on May 13, 2011, where she reported spending the majority of her day in her room, feeling depressed, and eating whatever her mother fixed. (Tr. 660). Plaintiff was encouraged to begin psychiatric treatment to address depression, which was "certainly an obstacle" to compliance with her dietary and exercise regimen. (Tr. 666).

On June 15, 2011, Plaintiff saw Michael Abdulian, M.D., and complained of pain and paresthesias in her wrist which had been ongoing for several years. (Tr. 669). Additionally, Plaintiff complained that the skin over her thenar region and incision was hypersensitive. (Tr. 699). Dr. Abdulian explained the symptoms could persist for a while but were likely to resolve and referred her to occupational therapy for desensitization techniques, scar massage, and strengthening. (Tr. 669).

9

On June 22, 2011, Jan A. Steinel, C.N.P., reviewed Plaintiff's sleep apnea and noted Plaintiff needed a new CPAP machine. (Tr. 675). The following day, a sleep study was performed which revealed obstructive sleep apnea, morbid obesity, and possible restless leg syndrome. (Tr. 688, 691).

On June 27, 2011, Plaintiff was treated by Dr. Jose Mendez for depression. (Tr. 678). Plaintiff said she felt depressed, lived with her mother, and had an irregular appetite, low energy, and low motivation. (Tr. 679). Plaintiff complained of feeling hopeless, helpless, and worthless. (Tr. 679). She had good judgment, insight, and recent and remote memory; sustained attention span and concentration; depressed affect; and congruent mood. (Tr. 681-82). She was diagnosed with depression and assigned a global assessment of functioning ("GAF") score of 51-60.[2] (Tr. 682).

On July 7, 2011, James Finley, M.D., reviewed a polysomnography report. (Tr. 690). He adjusted Plaintiff's CPAP water levels and noted Plaintiff needed to be counseled regarding sleep hygiene. (Tr. 692).

On July 18, 2011, Plaintiff presented to Jessica R. Griggs, D.O., and complained of ongoing right hip and lower back pain unrelieved by Celebrex. (Tr. 695). An x-ray of Plaintiff's lumbar spine revealed mild degenerative changes and a transitional vertebrae; an x-ray of her hip showed no identifiable abnormalities. (Tr. 699-700).

Plaintiff followed-up with Kathy Stroh, O.T., and claimed she had trouble cooking,

---

2. The GAF scale represents a "clinician's judgment" of an individual's symptom severity or level of functioning. American Psychiatric Association, *Diagnostic & Statistical Manual of Mental Disorders*, 32-33 (4th ed., Text Rev. 2000). A GAF score of 51-60 indicates moderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) OR moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers and co-workers). *Id.* at 34.

cleaning, fastening buttons and zippers, combing her hair, lifting plates, and gripping. (Tr. 701-02). Ms. Stroh instructed her to discontinue use of wrist splints and recommended a home exercise program. (Tr. 702).

On August 5, 2011, Plaintiff reported to Jessica R. Griggs, D.O., that Celebrex and Vicodin helped a little. (Tr. 704). Plaintiff's physical examination was unremarkable. (Tr. 704).

On September 7, 2011, Dr. Griggs provided an opinion regarding Plaintiff's residual functional capacity ("RFC"). (Tr. 720). She opined Plaintiff could sit for two hours in an eight-hour workday and stand or walk for thirty minutes in an eight-hour workday. (Tr. 724). Plaintiff could lift five-to-ten pounds occasionally and would need a five-to-ten minute break every thirty minutes. (Tr. 721). Dr. Griggs opined Plaintiff would miss one-to-two days of work per month and would be unable to perform repetitive tasks. (Tr. 721).

### State Agency Medical and Psychological Assessments

On September 24, 2008, Lynee Torello, M.D., reviewed Plaintiff's medical records and opined Plaintiff could lift 50 pounds occasionally, 25 pounds frequently, and stand or walk for six hours in an eight-hour workday. (Tr. 277-78). Dr. Torello further opined Plaintiff could never climb ladders, ropes, or scaffolds and could occasionally climb ramps and stairs, balance, stoop, kneel, crouch, and crawl. (Tr. 279).

On May 25, 2010, Mitchell Wax, Ph.D., conducted a psychological consultative examination. (Tr. 462). Plaintiff reported no difficulty working with supervisors, co-workers, or clients. (Tr. 479). Plaintiff had a good appearance, maintained good eye contact, and had appropriate thought content but appeared intellectually limited, sad, and anxious and had difficulty organizing thoughts to respond to simple questions. (Tr. 463, 465, 479-80). Plaintiff's speech was slow, her discussion was often vague and circumstantial, and her thoughts

11

fragmented. (Tr. 464). Dr. Wax found evidence of mental confusion, possibly due to low intelligence or anxiety, and only intermittent ability to concentrate. (Tr. 465). Plaintiff had only marginal memory for past, recent, and current events and had intermittent memory problems. (Tr. 465). Dr. Wax concluded Plaintiff was markedly impaired in ability to relate to others and to understand, remember, and follow instructions. (Tr. 483). He found Plaintiff was moderately impaired in ability to maintain attention, concentration, and persistence, and to withstand the stresses and pressures associated with day-to-day work activity. (Tr. 483). He diagnosed major depressive disorder, obsessive compulsive disorder, and borderline intelligence. (Tr. 483).

On June 13, 2010, state agency medical consultant Karen Terry, Ph.D., evaluated Plaintiff's medical records and completed a mental RFC assessment and psychiatric review technique. (Tr. 486-501). Dr. Terry opined Plaintiff was moderately impaired in all areas of functioning but retained the ability to perform simple, routine tasks in a routine, static, and predictable work setting that did not require strict production quotas or fast-paced performance and required only superficial contact with others. (Tr. 486-87, 506). On October 8, 2010, Kristen Haskins, Psy.D., affirmed Dr. Terry's opinion as written. (Tr. 523).

Plaintiff underwent a physical consultative exam by Dr. Adi Gerblich on June 30, 2010. (Tr. 508). She complained of lower back pain when she walked and associated shortness of breath. (Tr. 509). Plaintiff weighed 247.8 pounds and had a body mass index of 51.4. (Tr. 509). Plaintiff exhibited normal hand grasp and manipulation and negative Tinel signs in both wrists. (Tr. 509). Dr. Gerblich noted full range angles were not achieved in the knee and hip, primarily due to marked obesity. (Tr. 513). Plaintiff had 4/5 motor findings in all upper and lower extremities. (Tr. 510). Dr. Gerblich diagnosed depression, gastroesophageal reflux, hypercholesterolemia, hypertension, migraine headaches, obstructive sleep apnea, morbid

obesity, and TIA. (Tr. 509). He concluded Plaintiff could do all sedentary activities. (Tr. 509).

On July 13, 2010, state agency consultant Maureen Gallagher opined Plaintiff could occasionally lift 20 pounds and frequently lift ten pounds; could stand, walk or sit for six hours in an eight-hour day; occasionally climb ramps and stairs, kneel, or crawl; and never climb ladders, ropes, or scaffolds. (Tr. 516-17). Eli Pernevich, D.O., affirmed Ms. Gallagher's opinion as written on October 15, 2010. (Tr. 525).

### The ALJ's Decision

According to the ALJ, Plaintiff's severe impairments included morbid obesity, lumbosacral radiculopathy, depression, and borderline intellectual functioning. (Tr. 13). The ALJ determined Plaintiff had the RFC to perform light work except she could only lift up to twenty pounds occasionally, lift or carry up to ten pounds frequently and stand, walk, or sit for up to six hours in an eight-hour workday with normal breaks. (Tr. 19). Plaintiff was unlimited in ability to push or pull, could occasionally climb ramps or stairs, could not climb ladders, ropes, or scaffolds, could occasionally kneel or crawl, and could perform simple, routine tasks in a routine, static, and predictable work setting that did not require strict production quotas or fast-paced performance and had only superficial contact with co-workers, supervisors, and the public. (Tr. 19).

With these limitations, the ALJ determined Plaintiff was able to perform past relevant work as a housekeeper and therefore, was not disabled. (Tr. 24-25).

### STANDARD OF REVIEW

In reviewing the denial of Social Security benefits, the Court "must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in

13

the record." *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 528 (6th Cir. 1997). "Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Besaw v. Sec'y of Health & Human Servs.*, 966 F.2d 1028, 1030 (6th Cir. 1992). The Commissioner's findings "as to any fact if supported by substantial evidence shall be conclusive." *McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830, 833 (6th Cir. 2006) (citing 42 U.S.C. § 405(g)). Even if substantial evidence or indeed a preponderance of the evidence supports a claimant's position, the court cannot overturn "so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003).

### STANDARD FOR DISABILITY

Eligibility for DIB and SSI is predicated on the existence of a disability. 42 U.S.C. § 423(a). "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. § 416.905(a); *see also* 42 U.S.C. § 1382c(a)(3)(A). The Commissioner follows a five-step evaluation process – found at 20 C.F.R. § 404.1520 – to determine if a claimant is disabled:

1. Was the claimant engaged in a substantial gainful activity?

2. Did the claimant have a medically determinable impairment, or a combination of impairments, that is "severe," which is defined as one which substantially limits an individual's ability to perform basic work activities?

3. Does the severe impairment meet one of the listed impairments?

4. What is claimant's RFC and can she perform past relevant work?

5. Can the claimant do any other work considering her RFC, age, education, and

14

work experience?

Under this five-step sequential analysis, the claimant has the burden of proof in steps one through four. *Walters*, 127 F.3d at 529. The burden then shifts to the Commissioner at step five to establish whether the claimant has the RFC to perform available work in the national economy. *Id.* The court considers the claimant's RFC, age, education, and past work experience to determine if the claimant could perform other work. *Id.* A claimant is only determined to be disabled if she satisfies each element of the analysis, including inability to do other work, and meets the duration requirements. 20 C.F.R. §§ 404.1520(b)-(f) & 416.920(b)-(f); *see also Walters*, 127 F.3d at 529.

DISCUSSION

Plaintiff argues: 1) the ALJ erred in failing to find Plaintiff's carpel tunnel syndrome was a severe impairment (Doc. 13, at 20-21); and 2) the ALJ improperly weighed the opinions of Drs. Griggs, Wax, Gerblich, and Mendez and Maureen Gallagher (Doc. 13, at 21-22). Each argument is addressed in turn.

*Severe Impairment*

Plaintiff's first argument stems from the ALJ's obligation at step two of the disability analysis to determine whether a claimant suffers a "severe" impairment – one which substantially limits an individual's ability to perform basic work activities. 20 C.F.R. § 404.1520(a)(4)(ii); *Nejat v. Comm'r of Soc. Sec.*, 359 F. App'x 574, 576-77 (6th Cir. 2009). But the regulations do not require the ALJ to designate each impairment as "severe" or "non-severe"; rather, the determination at step two is merely a threshold inquiry. 20 C.F.R. § 404.1520(a)(4)(ii).

15

"[T]he mere diagnosis of an impairment does not indicate the severity of that impairment." *Mikesell v. Astrue*, 2012 WL 1288733 , *adopted by* 2012 WL 1288724 (N.D. Ohio 2012) (citing *Young v. Sec'y of Health & Human Servs.*, 925 F.2d 146, 151 (6th Cir. 1990); *Bradley v. Sec'y of Health & Human Servs.*, 862 F.2d 1224, 1227 (6th Cir. 1988)). "After an ALJ makes a finding of severity as to even one impairment, the ALJ 'must consider limitations and restrictions imposed by *all* of an individual's impairments, even those that are not 'severe.'" *Nejat*, 359 F. App'x at 576 (quoting SSR 96-8p, 1996 WL 374184, at *5). In other words, if a claimant has at least one severe impairment, the ALJ must continue the disability evaluation and consider all the limitations caused by the claimant's impairments, severe or not. And when an ALJ considers all of .a claimant's impairments in the remaining steps of the disability determination, the failure to find additional severe impairments does not constitute reversible error. *Nejat*, 359 F. App'x at 577 (citing *Maziarz v. Sec'y of Health & Human Servs.*, 837 F.2d 240, 244 (6th Cir. 1987)).

Here, the ALJ found Plaintiff suffers from severe impairments and considered Plaintiff's carpal tunnel syndrome in the remaining steps of the disability determination, both at step two and as part of the RFC determination. Specifically, the ALJ found Plaintiff's carpal tunnel syndrome was not a severe impairment because it had "no more than a minimal effect on [Plaintiff's] capacity to perform basic work activities." (Tr. 16). Further, the ALJ acknowledged Plaintiff's complaints of carpal tunnel syndrome, but found the complaints less than credible. (Tr. 20-21). To this end, although Plaintiff claimed residual pain, the ALJ pointed to Dr. Abdulian's notes that the pain would self-resolve and the fact Plaintiff was instructed to no

16

longer wear a wrist splint unless her wrist hurt. (Tr. 20-21). Further, Plaintiff underwent successful carpal tunnel release surgery in both hands. (Tr. 20).

Thus, any failure to find additional severe impairments does not constitute reversible error because the ALJ found Plaintiff suffers from severe impairments and considered Plaintiff's carpal tunnel syndrome in the remaining steps of the disability determination. *See Nejat*, 359 F. App'x at 577. Plaintiff's first argument is not well taken.

### *Treating Physician Rule*

Plaintiff argues the ALJ improperly considered the opinions of Drs. Griggs, Wax, Gerblich, and Mendez, and medical consultant Maureen Gallagher. (Doc. 13, at 21-22). This argument raises the treating physician rule.

Generally, the medical opinions of treating physicians are afforded greater deference than those of non-treating physicians. *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 242 (6th Cir. 2007); *see also* SSR 96-2p, 1996 WL 374188. "Because treating physicians are 'the medical professionals most able to provide a detailed, longitudinal picture of [a claimant's] medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone,' their opinions are generally accorded more weight than those of non-treating physicians." *Rogers*, 486 F.3d at 242 (quoting 20 C.F.R. § 416.927(d)(2)).

A treating physician's opinion is given "controlling weight" if it is supported by "medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with other substantial evidence in the case record." *Id*. When a treating physician's opinion does not meet these criteria, an ALJ must weigh medical opinions in the record based on certain factors.

17

*Rabbers v. Comm'r Soc. Sec. Admin.*, 582 F.3d 647, 660 (6th Cir. 2009) (citing 20 C.F.R. § 404.1527(d)(2)). These factors include the length of treatment relationship, the frequency of examination, the nature and extent of the treatment relationship, the supportability of the opinion, the consistency of the opinion with the record as a whole, and the specialization of the treating source. *Id*.

Importantly, the ALJ must give "good reasons" for the weight given to a treating physician's opinion. *Id*. "Good reasons" are reasons "sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight." *Rogers*, 486 F.3d at 242 (*quoting* SSR 96-2p, 1996 WL 374188, at *4). "Good reasons" are required even when the conclusion of the ALJ may be justified based on the record as a whole. *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004). A failure to follow this procedural requirement "denotes a lack of substantial evidence, even where the conclusion of the ALJ may be justified based upon the record." *Id*. (*citing Rogers*, 486 F.3d at 243). Accordingly, failure to give good reasons requires remand. *Id*. at 409–410.

Under the regulations, a "treating source" includes physicians, psychologists, or "other acceptable medical source[s]" who provide, or have provided, medical treatment or evaluation and who have, or have had, an ongoing treatment relationship with the claimant. 20 C.F.R. § 404.1502. A medical provider is *not* considered a treating source if the claimant's relationship with him or her is based solely on the claimant's need to obtain a report in support of their claim for disability. 20 C.F.R. § 404.1502. Non-treating sources are physicians, psychologists, or other acceptable medical sources who have examined the claimant but do not have, or did not have, an ongoing treatment relationship with them. 20 C.F.R. § 404.1502. This includes a consultative

18

examiner. 20 C.F.R. § 404.1502.

Last in the medical source hierarchy are non-examining sources. These are physicians, psychologists, or other acceptable medical sources who have not examined the claimant, but review medical evidence and provide an opinion. 20 C.F.R. § 404.1502. This includes state agency physicians and psychologists. 20 C.F.R. § 404.1502. The ALJ "must consider findings and other opinions of [s]tate agency medical and psychological consultants . . . as opinion evidence", except for the ultimate determination about whether the individual is disabled. 20 C.F.R. § 404.1527(e)(2)(ii).

Dr. Griggs

After seeing Plaintiff twice, on July 18 and August 5, 2011, family physician Dr. Griggs opined that Plaintiff could sit for two hours in an eight-hour workday, stand or walk for thirty minutes in an eight-hour workday, lift five-to-ten pounds occasionally, and would need a five-to-ten minute break every thirty minutes. (Tr. 721, 724). Dr. Griggs further opined Plaintiff would miss one-to-two days of work per month and would be unable to perform repetitive tasks. (Tr. 721). The ALJ found Dr. Griggs was a treating physician,[3] and afforded her opinion little weight. (Tr. 23).

Plaintiff argues the ALJ's reasons for affording Dr. Griggs' opinion little weight were flawed in two ways. First, Plaintiff takes issue with the fact that the ALJ noted Dr. Griggs

---

3. The ALJ accepted, without analysis, that Dr. Griggs was a treating physician. However, due to only a two-day treatment history, Dr. Griggs was not a treating physician and not entitled to deference. 20 C.F.R. § 404.1502 (a "treating source" includes physicians, psychologists, or "other acceptable medical source[s]" who provide, or have provided, medical treatment or evaluation and who have, or have had, an ongoing treatment relationship with the claimant).

examined Plaintiff only once, when the record indicates she saw Dr. Griggs twice. (Doc. 13, at 22; Tr. 695, 704). Second, Plaintiff contests the ALJ's statement that Dr. Griggs did not order or review any films because the record demonstrates Dr. Griggs ordered and reviewed two x-rays on July 18, 2011 (Doc. 13, at 22; Tr. 699).

Simply stated, these two errors do not amount to cause for remand in this case. First, the ALJ's statement that Dr. Griggs only saw Plaintiff once, instead of twice, is not significant because the underlying implication that Dr. Griggs did not have a lengthy treatment history with Plaintiff is the same.

More importantly, setting aside the proposed flaws in the analysis, the ALJ essentially exhausted the list of recommended factors as part of her decision to afford Dr. Griggs' opinion little weight. The ALJ noted "objective medical evidence in the record [did] not support Dr. Griggs's opinion", Plaintiff and Dr. Griggs had a short treatment history, Dr. Griggs' treatment notes were not consistent with disabling pain, the opinion rested in part on an assessment made in an area outside her expertise, and Dr. Griggs relied at least in part on Plaintiff's unreliable subjective complaints. (Tr. 23).

Thus, the ALJ complied with her regulatory obligations by providing good reasons to afford Dr. Griggs' opinion little weight, including the length of treatment relationship, the supportability of the opinion, the consistency of the opinion with the record as a whole, and the specialization of the treating source. *Rabbers*, 582 F.3d at 660 (citing 20 C.F.R. § 404.1527(d)(2)). Accordingly, the ALJ did not err by assigning Dr. Griggs' opinion little weight.

Dr. Wax

Next, Plaintiff argues the ALJ erred by affording little weight to consultative examiner

Dr. Wax's opinion that Plaintiff had a marked impairment in ability to understand, remember, and follow instructions or relate to others because of low intelligence and depression. (Doc. 13, at 23; Tr. 23). Specifically, Plaintiff argues, "the regulations recognize that Dr. Wax, as a consultative licensed psychologist for the Bureau of Disability Determination, is 'highly qualified' and is an 'expert' in the area of disability evaluations" and "[g]iven this level of expertise, Dr. Wax's opinion . . . should have been given significant weight." (Doc. 13, at 23).

To the extent Plaintiff argues Dr. Wax's opinion is entitled to the same deference as a treating physician, that argument is not well taken. As a one-time consultative examiner who evaluated Plaintiff for purposes of disability determination, Dr. Wax is not a treating source. 20 C.F.R. § 404.1502.

Moreover, the ALJ provided good reasons for affording Dr. Wax's opinion little weight. To this end, the ALJ noted Dr. Wax's opinion was contradicted by the evidence of record, relied on subjective reports rather than clinical testing, and did not have the benefit of reviewing the entire medical record. (Tr. 22-23). Stated differently, the ALJ considered at least two regulatory factors, including the supportability and consistency of Dr. Wax's opinion. *Rabbers*, 582 F.3d at 660 (citing 20 C.F.R. § 404.1527(d)(2)). Therefore, the ALJ did not err by affording Dr. Wax's opinion little weight.

Dr. Gerblich

Next, Plaintiff argues the ALJ erred by affording little weight to consultative examiner Dr. Gerblich's opinion that Plaintiff would be limited to sedentary activities. (Doc. 13, at 22). Plaintiff takes issue with the fact that the ALJ discredited Dr. Gerblich's opinion because the doctor did not receive information that Plaintiff provided childcare to her grandchildren from

21

2008 to 2010. (Doc. 13, at 22). Specifically, Plaintiff argues the ALJ misconstrued the scope of child care because Plaintiff testified she only provided part-time child care after 2008. (Doc. 13, at 22).

As a consultative examiner, Dr. Gerblich's opinion is entitled to less deference than a treating physician's opinion. 20 C.F.R. § 404.1502. Moreover, the ALJ provided good reasons for discrediting Dr. Gerblich's opinion. To this end, the ALJ discredited Dr. Gerblich's opinion because it summarily stated Plaintiff was capable of sedentary work without explanation, was inconsistent with the medical evidence, and was based on the fact Plaintiff had not worked since 2008. (Tr. 22).

Turning to Plaintiff's specific contention, the ALJ found Dr. Gerblich's opinion was based on the fact that Plaintiff did not perform any work whatsoever, when Plaintiff admits this was not the case because she provided part-time child care. Accordingly, Plaintiff's argument, that the ALJ's reasons were flawed, is not well-taken. Further, the ALJ complied with regulatory obligations by considering factors such as supportability and consistency, of the opinion. *Rabbers*, 582 F.3d at 660 (citing 20 C.F.R. § 404.1527(d)(2)).

Maureen Gallagher

Plaintiff argues the ALJ erred by identifying state agency medical consultant Maureen Gallagher as an "M.D.", when the record does not indicate whether she was in fact a medical doctor. (Doc. 13, at 22). Plaintiff argues this error entitles Ms. Gallagher's opinion to no weight, but does not claim the error requires remand. (Doc. 13, at 22).

Plaintiff's argument is not well taken. On review, Ms. Gallagher's opinion was affirmed as written by Eli Pernevich, D.O. (Tr. 516-17, 525). Moreover, Ms. Gallagher identified herself

as a medical consultant, and was considered as such by the ALJ. (Tr. 522). Accordingly, the ALJ did not commit reversible error.

Dr. Mendez

Buried in her brief, Plaintiff argues the ALJ erred by failing to mention Plaintiff's treatment with psychiatrist Jose Mendez, M.D. (Doc. 13, at 23; Tr. 678). Unfortunately, neither party provided further legal or factual analysis to this point.

On review, Plaintiff's argument is not well taken. First, Dr. Mendez is not a treating physician because he only treated Plaintiff one time. Further, it is unclear whether Dr. Mendez's assessment is a medical opinion. 20 C.F.R. § 404.1502; §§404.1527(a); 416.927(a) (Medical opinions are defined as "statements from physicians . . . that reflect judgments about the nature and severity of [a claimant's] impairments, including . . . symptoms, diagnosis, and prognosis, what [a claimant] can still do despite the impairments(s), and [a claimant's] physical or mental restrictions."). Plaintiff notably refers to Dr. Mendez's "treatment" of Plaintiff, rather than Dr. Mendez's opinion. (Doc. 13, at 23).

In sum, the ALJ properly considered the opinion evidence of record, including the opinions of Drs. Griggs, Wax, and Gerblich, and medical consultant Maureen Gallagher. Further, the ALJ did not err by failing to mention Dr. Mendez' one-time treatment notes.

*RFC*

Finally, to the extent Plaintiff argues the ALJ's decision is not supported by substantial evidence, the undersigned disagrees for the reasons outlined by the Commissioner. (Doc. 14, at 12-14).

In brief, the ALJ supported her decision with objective medical evidence including

23

medical opinion evidence and other evidence of record, laboratory findings, physical examinations, treatment history, compliance with diet and exercise recommendations and prescribed medications, Plaintiff's credibility, limited mental health treatment history, lack of psychiatric hospitalization or mental health counseling, and daily activities. (Tr. 19-24). Accordingly, Plaintiff's RFC determination is supported by substantial evidence.

### CONCLUSION AND RECOMMENDATION

Following review of the arguments presented, the record, and the applicable law, the Court finds the Commissioner's decision denying DIB and SSI benefits applied the correct legal standards and is supported by substantial evidence. The undersigned therefore recommends the Commissioner's decision be affirmed.

 s/James R. Knepp II
United States Magistrate Judge

ANY OBJECTIONS to this Report and Recommendation must be filed with the Clerk of Court within fourteen days of service of this notice. Failure to file objections within the specified time WAIVES the right to appeal the Magistrate Judge's recommendation. *See Thomas v. Arn*, 474 U.S. 140 (1985); *U.S. v. Walters*, 638 F.2d 947 (6th Cir. 1981).